POPOSIA COAL COMPANY, APPELLEE, V. NYE-SCHNEIDER-FOWLER COMPANY, APPELLANT.

FILED APRIL 11, 1921.  No. 21286.

1. **Sales:** OFFER SUBJECT TO WITHDRAWAL. The letter of plaintiff, dated August 10, 1916, set forth in the opinion, giving its list price of coal at that time, does not constitute a contract. It was an invitation to the recipient to purchase coal on the terms stated therein. It was not a continuing or standing offer, but was subject to modification or revocation by plaintiff at any time before a contract was entered into.

2. ———: OFFER: ACCEPTANCE. Where, in such case, a purchaser sends an order two months afterwards for 84 car-loads of coal, a contract is not complete until the order is accepted.

3. ———: ———: ———: COUNTER OFFER. Where, on receipt of the order, it is accepted by the seller subject to conditions stated in the letter of acceptance, these conditions constitute a counter proposal. If accepted by the buyer, the contract consists of the list price as modified by the conditions.

4. ———: CONTRACT: CUSTOMS. Where a custom, or usage, of the coal trade with reference to the time of payment for coal delivered is recognized and understood by both parties at the time a contract is entered into, such custom becomes a part of the contract.

5. ———: ———: ABANDONMENT. Where one party to an executory contract for the sale of coal refuses to carry out the provisions of the contract with reference to payment for coal delivered, at a stated date, and notifies the other party that, unless certain conditions are complied with, it will purchase the goods elsewhere to the seller's account and charge it with the extra cost, the seller may elect to treat the contract as renounced and abandoned, and is under no obligations to continue shipments or to respond in damages for failure to deliver thereafter.

6. ———: ———: CONSTRUCTION. Under a contract a seller agreed to furnish lump and egg coal to the buyer in its "turn." The evidence establishes that in the coal trade this means in turn after prior orders were filled and prior contracts complied with, and when sufficient small grades of coal had been sold so as to keep the mines running.

7. ———: BREACH OF CONTRACT: DAMAGES. Where the evidence fails to show that any prior customer has failed to receive coal as ordered, and it is proved that orders for coal were sent the

seller by later customers and filled within a few days, for coal of the grade contracted to be delivered to the buyer, the seller then being in default of filling the buyer's orders according to contract, the buyer is entitled to recover damages for nondelivery of the coal diverted and delivered to such later customers when it should have been delivered to the buyer.

APPEAL from the district court for Dodge county: FREDERICK W. BUTTON, JUDGE. *Affirmed in part, and reversed in part.*

*Courtright, Sidner, Lee & Jones,* for appellant.

*Brogan, Ellick & Raymond, contra.*

LETTON, J.

Plaintiff is a corporation engaged in mining coal in Wyoming. Defendant is a corporation engaged in selling coal at retail in a number of towns and cities in Nebraska. The action was brought to recover for the purchase price of a number of car-loads of coal sold and delivered by plaintiff to defendant.

The answer practically admits the selling and delivery, but by way of cross-petition sets forth certain correspondence between the parties which it is alleged constitutes a contract by the plaintiff to sell to the defendant coal until April 1, 1917, at prices specified therein, and that plaintiff failed to deliver coal ordered under the contract. It is also alleged that defendant's damages for breach of the contract are $1,679.73 in excess of the amount due plaintiff for coal purchased and delivered.

The reply in substance denies that the correspondence pleaded constitutes any agreement to furnish coal other than that delivered, and further pleads that, as a part of the agreement, defendant was bound to make payment in full for the shipments of coal made during each month, on or before the 10th day of the succeeding month; that it failed to pay for the coal shipped to it in December, 1916, on or before the 10th day of January, 1917, and still refuses to pay for the same, and that by reason of such violation and refusal plaintiff was released from any further

obligation to furnish coal to defendant.

A jury was waived. The court found "that the letter of August 10, 1916, was not a contract but a mere price-list, and that the later correspondence does not aid;" found generally for the plaintiff for the value of the coal delivered, and dismissed defendant's cross-petition. Defendant appeals.

The initial letter of the correspondence between the parties is dated August 10, 1916, and is in substance as follows:

"Nye-Schneider-Fowler Co., Fremont, Nebraska. Gentlemen: Our list prices in effect at this time are lump 7", $1.75. * * * These prices, subject to the concession of 10c per ton as heretofore, will remain unchanged and apply to your orders until April 1, 1917, except west of Valentine after August 15, 1916, the price will be $2 list and subject to change. Yours truly, Poposia Coal Co., by G. F. Collins."

On October 12 defendant ordered "one car Poposia egg, no hurry." The next letter in evidence is dated October 16, 1916. It is directed to Mr. Thomas, the manager of the defendant company. In substance it states that the writer, Mr. Barber of the plaintiff company, had made a trip over part of the territory of the defendant and talked to its local managers. It urges that defendant push the sale of its coal, and incidentally says: "There is never any question but what they can get plenty of it." In reply to this on October 21 defendant sent a letter, the essential part of which is as follows:

"We have your letter of the 16th, and between the superintendents and myself we made up orders for 43 cars of lump and 41 cars of egg in addition to those already sent you. If you would rather bill these cars to some point, for instance, Clearwater (except those that go west of that point) and let us do the diverting to points we might need the coal the worst, you may do so, as I take it for granted it would be pretty hard for you to ship all of these within a very short period, and by the time the

last car got to destination it might be needed pretty badly and some others might not need them so badly. However, we merely make that suggestion, but believe it a pretty good one. Would be glad to have you write me what you think about it."

A list of towns and the number of cars to be shipped to each was inclosed. On October 23 plaintiff replied as follows:

"Mr. A. R. Thomas, Fremont, Nebr. Dear Sir: We are just in receipt of your orders and also your telegram, advising us that they were coming. I am glad you sent the telegram as we were not in shape to stand a heavy shock at that particular time. We expected you to jog things along there and asked you to do it, but did not suppose that you were going to land on us with such a bunch all at once. However, we will place them on our file and give them their turn which we presume will be all right with you as, no doubt, there is no particular hurry about most of them. Before this order came, we already had on file about 200 orders and our output on lump and egg is limited, so it will take quite a while to fill what we have on hand."

The real question in the case is whether a meeting of the minds occurred by the communication of August 10, and the letter of October 21, so as to constitute a contract, or whether the letter of October 21 was an offer to buy the 84 cars of coal mentioned therein which required acceptance. If, as defendant asserts, a contract was offered by the first letter and closed by the letter of October 21, it was unconditional, and the plaintiff would be liable if a breach occurred.

The letter of August 10 does not appear to have been written in answer to a specific inquiry by defendant. It is a general statement of the "list prices in effect *at this time.*" We think it was nothing more than an invitation to defendant to enter into new business relations with the plaintiff. It is true it is said "these prices * * * will remain unchanged and apply to your orders until

April 1, 1917;" but, until an offer to purchase was made by the defendant, there was no mutuality in the transaction and the plaintiff had the right to change its quotation at any time. *Moulton v. Kershaw,* 59 Wis. 316; *Tanning Co. v. Telegraph Co.,* 143 N. Car. 376; 23 R. C. L. 1280-1291, secs. 96-107.

In *Nebraska Seed Co. v. Harsh,* 98 Neb. 89, Harsh stated he had about 1,800 bushels of millet seed, of which he mailed a sample, and said: "I want $2.25 per cwt. for this seed f. o. b. Lowell." Two days afterwards plaintiff wired an order for 1,800 bushels of millet at defendant's price. The court said: "The language used is general, and such as may be used in an advertisement or circular addressed generally to those engaged in the seed business, and is not an offer by which he may be bound, if accepted by any or all of the persons addressed." A number of cases holding the like are cited in the report and annotation of this case at L. R. A. 1915F, 824, 825.

Plaintiff was offering coal to any purchaser at the list price of $1.75 a ton, but a special concession of 10 cents a ton was continued to defendant in accordance with a previous custom. The list price was quoted on August 10, the order for 84 cars was not sent until October 21, a delay of more than two months. Plaintiff did not accept this unconditionally, but on October 23 advised defendant that it was not able to accept an order of such magnitude at that time, and made the counter proposal that it would place the orders on file "and give them their turn," also stating that, "before this order came, we already had on file about 200 orders and our output on lump and egg is limited so it will take quite a while to fill what we have on hand." The letter also stated that its output of lump and egg could not be increased "without getting some business on the nut and steam coal." This letter was a distinct notification that plaintiff did not accept the offer of defendant to purchase the 84 cars of coal on the terms of the letter of August 10, and constituted a counter proposal to accept the order on the conditions specified in the

letter. About a week or ten days later plaintiff in other letters explained and emphasized the condition that, unless it had orders for smaller grades and screenings, it would be unable to ship lump and egg coal as ordered.

In its amended cross-petition defendant first pleads that the letter of August 10 was a written contract, but in another paragraph seems to consider the contract completed by the acceptance of the counter proposal of October 21, because it pleads as follows: "The defendant, as shown in the correspondence, exhibits C to S, inclusive, agreed to place defendant's orders on file and to ship the same in regular turn with other orders according to the priority of the receipt of orders and and the plaintiff failed to ship the cars shown in exhibit B as being in default in the order of placing of orders with the plaintiff, and plaintiff therefore committed a breach of said agreement, and plaintiff also agreed to ship all of said cars shown in exhibit B within a reasonable time, and failed, neglected and refused to do so."

We are of the opinion that no contract was consummated until the order for 84 cars had been accepted, and, since the acceptance of this and later orders was conditional, the conditions formed part of the contract, and there could be no breach until the conditions had all been fulfilled. The subsequent correspondence and the acceptance of the coal shipped after October 21 was an assent to the counter proposition and completed the contract.

It is shown that the custom of the trade was that all shipments made during one month were to be paid for by the 10th of the next month. Defendant failed to pay for the coal furnished in December, and plaintiff notified it by wire on January 6, 1917, that, unless it did so, it would cease shipping, on account of a threat made by defendant that, unless ten cars were shipped by a certain date and an average of three cars a day thereafter, it would purchase elsewhere and charge the extra cost to plaintiff. No coal was shipped thereafter.

The failure of defendant to pay for the coal shipped in

December and the notification that plaintiff would refuse to ship more coal until this account was paid constituted a rescission or abandonment of the contract, and no damages can be claimed for a failure to ship after that date. *Quarton v. American Law Book Co.*, 143 Ia. 517. Whether there was a breach of the contract by plaintiff before that time depends on the meaning of the phrase, "giving them their turn," as used in the letter and in the coal trade when construed in connection with the statement that the shipment of lump and egg coal depended on the proportion of nut and pea coal ordered. Mr. Barber testifies that the term has a definite meaning in the coal business, that "'turn' wouldn't mean to take a list of orders that came in and ship the coal according to the way the orders came in, as the orders would have to be for the coal in proportion to the way it had to be mined. For instance, if some one sent 100 orders for lump coal and no orders for screenings, it would be impossible for the mine to fill a single order, as the railroad company would not allow us to load up the screenings and let them stand on the track in cars. * * * If we had orders for the lump and no orders for the screenings, the mine would have to close down until we disposed of the screenings; so, if one firm would order all lump and egg and no screenings, it would be impossible to fill the order. * * * And the trade meaning among dealers and mine operators of the phrase, 'furnishing coal in their turn,' means not in the order of the dates that the orders are received, but means in the order that you are able to dispose of the entire output of the mines."

The evidence shows that plaintiff supplied the Chicago & Northwestern Railway Company, the United States Soldiers Home at Hot Springs, South Dakota, Sunderland Bros. Company, and some others, during October, November, and December under previous contracts and orders, and that an emergency arose in certain towns in Wyoming on account of the scarcity of cars and the limited supply of coal from other sources, which demanded that the neces-

sary coal to preserve life and property from the severity of the winter should be furnished by the plaintiff. The evidence is that these towns had no other opportunity to procure coal. The dictates of humanity required that this coal be supplied. *Salus populi suprema lex.* These conditions were communicated to the defendant. For furnishing this coal to the extent actually necessary, we think plaintiff should not be penalized.

It is not shown that other coal shipped was not under prior orders, except that 14 cars of lump and egg coal were shipped in November to two customers in Omaha on orders sent in November after the contract with defendant had been made. The price of coal had advanced materially on account of the war and shortage in supply. We are convinced from the evidence that these cars were delivered to the purchasers when they should have been sent to defendant. Plaintiff contends that it may have made up this preference by January 5, but we find no evidence to support this. The evidence clearly shows that defendant would have made a substantial profit if these 14 cars had been shipped to it instead of to later customers. It is said that other prior customers may also have been damaged, and that the damages should be prorated. There is no proof that contracts with other customers had not been complied with at that time.

The judgment of the district court dismissing the cross-petition is therefore reversed, and the cause remanded, with instructions to ascertain the difference between the contract price of the 14 cars of coal mentioned and the market price of coal of like grade and quality, and to allow defendant credit for the same. In all other respects the judgment is affirmed.

AFFIRMED IN PART, AND REVERSED IN PART.