**PRIDDY et al. v. CHILDERS.** (No. 1759.)*

(Court of Civil Appeals of Texas. Amarillo.
Nov. 15, 1922. Rehearing Denied
Feb. 14, 1923.)

**1. Brokers ☞74—Employer of broker liable for compensation regardless of his interest in property.**

One who employs a broker to find a purchaser is usually liable for compensation, regardless of the nature of his interest in the property.

**2. Principal and agent ☞123(8)—Evidence held to authorize finding that listing was authorized by owner.**

In an action by a broker for compensation, evidence *held* sufficient to warrant a jury finding that one defendant, a bookkeeper for his codefendant, the owner of the land, was authorized by the owner to place the land in broker's hands for sale.

**3. Principal and agent ☞102(1)—Appointment of broker may be personally by principal or by authorized agent.**

Authority to act as agent or broker can arise only at the will and by the act of the principal, but the appointment may be either the personal act of the principal or the act of his duly authorized representative.

**4. Brokers ☞86(1)—Evidence held to warrant finding that owner increased price after broker procured purchasers.**

Where the owner of oil lands kept a printed list of oil lands and leases for sale on which was printed the qualifying statement, "All prices subject to change or withdrawal, and on which was written the words, "Subject to change without notice," evidence in an action by a broker for commissions where the owner refused to sell to purchasers obtained by the broker *held* sufficient to warrant a jury finding that the owner raised the price after the broker procured purchasers ready and able to buy at the former price given by the owner.

**5. Brokers ☞44—Owner cannot withdraw listing after broker has procured purchaser.**

A stipulation on a list of oil lands and leases for sale, "All prices subject to change or withdrawal," under which the broker undertook to procure purchaser, added no more to the owner's protection than the law gives him, since a listing with a broker or an offer of sale may be withdrawn at any time before acceptance, but such stipulation did not authorize the owner to withdraw the listing after the broker had procured purchasers to take the land at the listed price, and so defeat the broker's right to commission, even though such listing had written across it, "Subject to change without notice."

Hall, J., dissenting in part.

Appeal from District Court, Wichita County; Edgar Scurry, Judge.

Action by F. T. Childers against W. M. Priddy and another. Judgment for plain-tiff, and defendants appealed. Judgment affirmed.

Martin & Oneal, of Wichita Falls, for appellants.

Harris & Martin, of Wichita Falls, for appellee.

HUFF, C. J. This case was affirmed at a former term of this court (231 S. W. 172), on the ground that the assignment was too general as predicated upon a requested instruction, to the effect that the evidence was insufficient to sustain a verdict against the defendants. This court had held the testimony was sufficient upon the original hearing to authorize a recovery against Brasher, but upon motion for rehearing affirmed the case on the grounds first above stated. The appellant, upon petition, secured a writ of error in the Supreme Court. The honorable Supreme Court has reversed the holding of this court (240 S. W. 1107), and we are directed to pass upon the sufficiency of the evidence as to the liability of the appellants or either of them.

Childers brought suit against W. M. Priddy and Del S. Brasher to recover the sum of $1,250, as a commission due him in procuring purchasers ready, willing, and able to buy the oil lease described at the price and on the terms for which it was listed with him as a broker to find a purchaser. The purchasers proposed were then ready, willing, and able to buy and were duly presented to appellants, who refused and declined to assign the lease to them. Appellants answered, by general exception and general denial.

The case was submitted to a jury upon special issues, who found:

(1) That Del S. Brasher owned an interest in the 2½-acre lease described in the petition.

(2) That his interest was $3/100$ of the profits on sale.

(3) That Brasher was authorized by Priddy to place the land with appellee for sale at a price of $5,000 per acre.

(4) Priddy had not revised the price of the 2½-acre lease at the time appellee brought Brooks, Simmons, and Moore, the proposed purchasers, into his office.

(5) Priddy did revise the price on the land after the time appellee brought the proposed purchasers into his office.

The appellant requested an instructed verdict on the ground above stated. The assignment is predicated upon the refusal to so charge the jury. The propositions thereunder presented are:

(1) If the evidence is insufficient upon any theory of the case to sustain a verdict upon request, the court should give an instructed verdict for the defendants, and such refusal will require a reversal of the case.

(2) "An averment by plaintiff of the joint

employment of him as a broker by two defendants to procure a purchaser of an oil and gas lease is not sustained by proof of employment of him by only one defendant, which employment is not participated in by the other defendant, and such variance is fatal when an instructed verdict is requested by defendants."

The very question presented by appellants in the second proposition has been expressly ruled against appellant's contention by the Supreme Court, in a commission suit brought by a real estate broker. McDonald v. Cabiness, 100 Tex. 615, 102 S. W. 721. See, also, Negociacion, etc., v. Love (Tex. Civ. App.) 220 S. W. 224 (9).

When we last considered this case, we interpreted that by the propositions appellants considered the evidence as to a several contract was a variance from the allegation of a joint contract, and that this was the theory which demanded an 'instructed verdict. It seems that we were in error in reading the two propositions together. We are therefore required to find whether the evidence will support a verdict against one or both of the appellants. We presume the assignments in the motion for new trial and in this court, to the effect that the verdict is contrary to the evidence and that the evidence is wholly insufficient to support the verdict, are so general that they did not call upon the trial court and will not require this court to examine the testimony on those assignments. Rule 68 for district courts (142 S. W. xxii) and rule 26 for Courts of Civil Appeals (142 S. W. xii); Clark v. Pearce, 80 Tex. 146, 15 S. W. 787; Telegraph Co. v. Mitchell, 89 Tex. 443, 35 S. W. 4; Sanger Bros. v. Craddock (Tex. Sup.) 2 S. W. 196; Gross v. Hays, 73 Tex. 515, 11 S. W. 523. We have understood when an assignment is predicated upon the refusal to give a charge it will not be necessary in the assignment to give the reason for the charge or the statement of the particular error of which complaint is made. It will be sufficient to follow the assignment with the propositions relied upon as showing the error in the refusal of the charge. Land Co. v. McClellan Bros., 86 Tex. 179, 23 S. W. 576, 1100, 22 L. R. A. 105. The assignment in this case is here followed with two propositions, the second of which is specific enough and properly disposed of by this court in its former opinion, as above pointed out. If there is "any theory" to support which the evidence is insufficient to sustain a verdict, it is, to say the least of it, pointed out by the proposition in a very general way. We may doubtless surmise a theory which appellants may think the evidence insufficient to support a verdict. However, a more specific designation of the particular thing would aid us. If we gather correctly from appellants' brief by their recitation of certain evidence and their several arguments, they contend: (1) As Brasher had no title in or to

248 S.W.—10

the land, but only an interest in the profits on sale, he could not make a contract with the broker which would bind him for a commission; (2) as Priddy never saw Childers, he could make no contract of listing with him; (3) as Brasher was only a bookkeeper for Priddy in his office, he was not authorized to contract with appellee to sell the land or to place the land with appellee for sale at a price fixed by Priddy; (4) as Priddy gave out his list of lands for sale with the right to change the price without notice, he could do so at any time he saw proper. There may be other essentials necessary to be shown by the evidence and upon which appellants rely, but we are not at this time able to perceive them or to surmise any other.

On the trial of the case below it was agreed that the proposed purchasers for the 2½ acres were ready, willing, and able to buy the same at the price of $5,000 per acre on April 26, 1919. The appellee, Childers, on that date and prior thereto, was engaged in the brokerage business, and was handling oil and gas leases. On the 23d day of April, 1919, appellee went to Priddy's office for a listing on some of his leases. Brasher was in the office, and appellee asked him what he had. Brasher replied:

" 'We have 2½ acres in block 61 that I hold an interest in.' So he gave me a listing on it of $5,000 an acre, paying me 10 per cent. He said, "We will deliver the lease at that price.' "

The appellee was unable to sell the land on the first day of its listing, and the next morning went back for a verification of the listing. Brasher verified the original listing. Appellee afterwards, on that day, met Brooks and other parties who wanted the land, and before taking them to the office appellee again went to the office for a verification of the price. Brasher stated to appellee he would deliver the property at that price, and that the list was there in the office. The appellee then left for the purchasers and took them to Priddy's office and went into Priddy's office to see him. Priddy said to appellee, "What is going on out there?" Appellee replied, "Not a thing that I know of to excite anybody." Priddy said, "Well, I would like to have a few minutes to try to find out what is going on out there." Appellee told Priddy the parties were ready to buy the lease, but he refused to deliver the lease at that price, but offered to deliver it at $6,000 per acre and pay appellee 10 per cent commission, and would not deliver at $5,000 an acre. The parties had quite an argument over the matter. There appears to have been a printed list of land, including the particular land in question, in Priddy's office on the day on which the appellee visited the office, and that he saw it there on the day he brought the parties to purchase and before. The purchasers also saw the list.

On the printed list there was written across the top of it, "Subject to change without notice." Appellee did not see Priddy when he obtained the listing from Brasher, and did not know him or know he owned the land, and possibly did not see the printed list when Brasher first listed the land with him, but did see it when he returned for a verification of the price the first time. He did not see Priddy until he took the purchasers into his office. He testified Priddy did not tell him that the price was $6,000, but he refused to deliver it at $5,000, and offered to sell it at $6,000. Priddy did not tell him that he would not get the land at $5,000, and that the price was $6,000. He said he would not deliver at $5,000, but would sell for $6,000. "He said he would like to have time to find out what was going on out there."

D. S. Brasher testified:

That at the time Childers came into the office he was then working for Priddy as bookkeeper, and that Priddy owned an oil lease in block 61. "He had a list of the price that he would sell that lease at at that time. This is a copy of that list there (reading the list), 'Leases near the Burk-Waggoner well for sale by W. M. Priddy. All prices subject to change or withdrawal.'" That this printed form was then in the office where appellee talked to the witness. "Mr. Priddy at that time never authorized me to make a price or sell any of his acreage; he always said that he confirmed the selling and the buying himself." "With reference to Mr. Childers coming up there on or about the 23d day of April, a few days before the sale here, in which he claims that he had some purchasers, he first came up there and talked to me. He came to see Mr. Priddy, and he was busy at the time. We got in some kind of a conversation about this lease, and I just listed that with him there accordingly. I had a list there in my pocket, and I told him about this 2½ acres in particular that he could sell. The list was a copy of the one just like that. I looked at that list to see what it was. I did not know anything else about it. Mr. Childers then came back the next day to see if the list had been changed in any way or withdrawn. He talked to me. He looked at the list again. He came back two or three times. He came back and confirmed it two or three times. The first two or three times he came back it had not been changed. The last time he came back before bringing these parties up there he asked me if that price was still good. With reference to what I said on that day when he asked me if it was good, I would not think about giving him an answer without going and looking at the list. I did not know. I did not drill the acreage myself. I went over to the desk and asked one of the stenographers in the office. She said: 'There is the list there.' I looked in the desk drawer there. I told him that was the last price on it; that was all that was said there. I said: 'That is the last price given.' I was looking at this statement in Mr. Priddy's drawer. Mr. Priddy never authorized me to make any statement to Mr. Childers about prices of anything."

This witness also stated that Priddy was in the office when appellee came up the last morning to verify the prices, but was busy with other parties, and he did not want to disturb him; some 30 minutes after Childers came up with the purchasers, which was about 9 or 10 o'clock in the morning, and the witness told him to see Priddy; that witness and some other parties in the office had an interest with Priddy in the land; that he had not purchased it himself; that it was just a kindly act on the part of Priddy to "cut me in on some of the acreage there"; that he was not authorized to sell it, nor had he been authorized to make any statements to Childers by Priddy. The witness said:

"You might say that I had an interest in it. I told Childers that I had an interest in it at the time I listed it."

The price on the list which he had testified from was $5,000 an acre the first time he gave it to Childers, and was the same the last time he gave it to Childers. He told Childers 30 or 40 minutes before he brought the men into the office.

"I told Childers that it carried a 10 per cent. commission. Mr. Priddy himself had left that price list in the office. With reference to Mr. Priddy writing it up or having his stenographer to write it up and left there with me, they were scattered all over the office—all over town. Mr. Priddy left that in the office for the brokers to get. I did not have any instructions. * * * I or any one else in the office force there had a right to submit these to any broker or to any other purchasers that asked for them. We did that."

Priddy had the list made up. The witness did not know there was a rumor of a well in block 61. If he had known it, he would not have given Childers that price, but would have gone to see Priddy; did not know that he had authority to give Childers the price; was never authorized.

The effect of Priddy's testimony is that prior to the day Childers came in to see him he had the property listed at $5,000 per acre, but there was a rumor of a well on the block, and that he advanced the price to $6,000. When Childers first came to his office Priddy asked at what price he thought he was selling, and Childers said $5,000. Priddy told him he would not want to sell at that price, and that he had advanced the price to $6,000; that he then told Childers to bring up the parties and they might be willing to pay $6,000, but that when they came up they would not pay that amount. He did not authorize Brasher to sell or list to Childers. "He had no authority from me to handle this lease in any way, shape, or form." He had given Brasher and other members of his working force each a $^{33}/_{100}$ working interest in the profits on the sale of the land listed, which included the tract in question.

The witness further testified that he had heard a rumor the night previous of a well brought in, or about to be brought in, on the block, and that he arrived at his office late the next morning; that very soon after he arrived he advanced the price and made a pencil memorandum on different lists as to the advanced price, testifying from a particular list upon which the advance appears to have been marked. He said he marked the advance on several lists. "Here is one I had on my desk. * * * I made these notations on this particular list." He says he made the pencil change and had it before him when the purchasers came in. On cross-examination he says Childers first came to see him alone and afterwards brought up the purchasers, and with reference to the list he stated he made them out for his private convenience; that he had given out a great many lists to people who asked him the price of his land, and when they did so he would hand them a list; that he did not particularly remember handing the list to his office force, but they had access to his desk when it was open. He did not leave the list in his office for the purpose of selling the leases. "Del Brasher knew at that time that we were paying a 10 per cent, commission on these leases." He denied making the change in the price while Childers and the purchasers sat there and that it was then that he made the change. He states he never had any conversation with Childers or listed the land with him until the time he came into his office and told him he had sold it. Childers, on being recalled, testified that, when he and the purchasers went into Priddy's office, Priddy, while sitting there with the list, then penciled the changes in the price on the list.

Brasher, as shown by the testimony, listed the land to appellee, representing at the time he did so he had an interest in the same. The facts show that he would have been entitled to only $33/100$ interest in the profits, and the jury substantially so find. It cannot be very well denied that he made the contract with appellee and agreed to pay 10 per cent. commission. The question of his title to the land we believe to be of no material interest. He doubtless believed he was acting for the interest of himself and others who were interested with him in the sale. If, for any reason, Priddy is not liable, certainly Brasher would be, and appellee may look alone to him for compensation. He purported to have the right to list, and so represented in listing the property. The question is, under the facts of this case, whether his acts and statements were such as amounted to a representation that he had authority to make a contract. If he did, and appellee relied thereon and procured purchasers for the land, appellee was entitled to recover from him. Hays v. Deeley (Tex. Civ. App.) 204 S. W. 1177; Smye v. Groesbeck (Tex. Civ. App.) 73 S W. 972;

McDonald v. Cabiness (Tex. Civ. App.) 98 S. W. 943.

[1] "One who employs a broker to find a purchaser is usually liable for compensation, regardless of the nature of his interest in the property." 9 C. J. 586, notes 92 and 93. We are inclined to think, even if appellee had known that Priddy was the owner, he yet could rely on the statement that Brasher had an interest. There is, therefore, sufficient evidence to authorize a judgment against Brasher whether Priddy did or did not authorize a listing with him.

[2] But the jury find that Brasher was authorized by Priddy to place the land with appellee for sale at the price of $5,000. It seems to use this finding is supported by the evidence. Priddy made out a list of lands for sale, among which was the tract in question, giving the price of each tract. This list appears to have been printed and to have been given out to all parties asking the price, and Priddy admits Brasher knew there was a commission of 10 per cent. on sale. Brasher says the list was made and scattered all over town and placed with the office force of Priddy, and that they were given the right to hand them to brokers, and that there was a 10 per cent. commission on sale. It occurs to us when Priddy made the list, fixed the commission, and gave his office force the right to hand it to brokers with the knowledge there was a 10 per cent. commission on sale and if placed in the hands of brokers by his employees in the office and a sale effected, he should be held thereby to have made a listing contract. He took that method of listing his property and soliciting the services of brokers, and he should not be heard to say he made no contract with a broker performing the services so secured simply because he had not personally talked or agreed with the broker. It may be true that Brasher had no right to fix the price or to sell the land or employ agents, but such want of authority would not prevent Priddy from using him as an instrumentality in effecting his purpose. If Priddy had written a letter to appellee, giving a price on the land and intrusted it to Brasher to deliver, with the statement there was a 10 per cent. commission, and the appellee had sold it, we believe it would hardly be contended there was no contract of enlistment because Priddy did not see Childers in person or authorize Brasher to fix the price or sell the land or employ an agent. Priddy simply used Brasher as an instrumentality to deliver the price list to a broker, and Brasher did just what he was authorized to do. Loughlin v. Greenwood, 181 S. W. 517. The authority of appellee to find a purchaser need not be expressly shown.

"In the great majority of cases it is uniformly conferred or is presumed from acts and conduct of the principal. A large portion of the transaction of the modern business world is

carried on by simple and informal means. A word or look or gesture often suffices to give assent to great undertakings or to set in motion the complicated machinery of commerce. * * * Hence it is that in many cases the existence of an agency is implied or presumed from the words or conduct of the parties, although the creation of an agency was not within the immediate contemplation." 1 Mechem on Agency, § 241.

[3] Of course, it is an invariable rule that authority to act as agent can arise only at the will and by the act of the principal. Its existence is always a fact to be proved by tracing it to some act of the person alleged to have created or conferred it. The appointment must be a personal act of the principal, except when he has expressly or by implication authorized some one else to appoint agents.

"While it is thus true that authority to act as agent can usually arise only at the will and by the act of the principal, that will and act may find expression in a great variety of ways. Usually no particular method or form of expression is essential, and the range of possible forms is ordinarily as wide as the domain of human action." 1 Mechem on Agency, § 211.

"Thus the mere leaving of the description of the property at the office of a broker by the owner or his agent, with a request that the broker sell the property at a designated price and on designated terms, amounts to an employment of the broker." 9 C. J. "Brokers," § 18, p. 516.

The facts in this case are fully as strong as the one above instanced. The lists were prepared by Priddy to hand to brokers with the price affixed, with the instruction as to the amount of commission to be paid on sale and the authority conferred upon the office force to give the list to brokers. This act and conduct of Priddy were sufficient, in our judgment, to authorize a finding of enlistment by Priddy and Brasher, and the jury, we think, are sustained in their finding by the evidence.

[4, 5] The jury, under the facts, were justified in finding that Priddy changed the price of the land after appellee introduced to him the purchasers who were then ready, willing, and able to purchase. If Childers states truly, Priddy changed the price while talking to the parties and after the purchasers had accepted the offer and were then able and willing to comply with the contract. The court, on findings of the jury, we think, was justified in rendering judgment for appellee for the amount sued for. The stipulation on the list, "All prices subject to change or withdrawal," we do not think authorized Priddy, after purchasers had been procured who were ready and willing to take the land at the price listed, to defeat the broker who had secured the purchasers in a recovery of the commissions agreed upon. Montgomery v. Amsler, 57 Tex. Civ. App. 216, 122 S. W. 307 (13), at page 312, second column; Hancock v. Stacy (Tex. Civ. App.) 116 S. W. 177 (4); Id., 103 Tex. 219, 125 S. W. 884 (1); Evans v. Gray (Tex. Civ. App.) 74 S. W. 575; Martin v. Jeffries (Tex. Civ. App.) 172 S. W. 148.

The assignments assailing the submission of issues 4 and 5 are overruled. The issues as submitted are not subject to the criticism offered in the brief and submitted an issue raised by the evidence, and therefore were proper.

The dissent in this case presents, as we understand, a ground not pleaded or apparently urged in the court below or in this court by brief; that is, that the list of land with the testified qualifications on it was not an offer, but was in the nature of an advertisement or solicitation for negotiations. It should be noted that the list itself was not offered in evidence. It is true that Childers, in testifying, says that the list had written across the top of it, "Subject to change without notice," while Brasher read from the list: "Leases near the Burk-Waggoner well for sale by W. M. Priddy. All prices subject to change or withdrawal." Priddy or Brasher neither testified that the list contained the heading mentioned by Childers. The testimony indicates Childers was giving his recollection in answer to questions while Brasher read from the list itself. The list would appear to have been before the trial court. If there is anything in this contention, it should be construed in favor of the judgment of the court. It is a general rule when a party makes an offer of sale, if he wishes to withdraw it, he must notify the offeree before acceptance. It would seem if the heading was on the list, as stated by Childers, that Priddy understood it to be an offer. He only qualified the general rule by reserving the right to change without notice. This is also indicated by his testimony. He in effect stated on the rumor of a well he changed the price before the proposed purchasers accepted the offer. The jury found that he did not do so, but that he did so after acceptance by the purchaser. These findings are amply sustained. Priddy evidences by his testimony that he understood by his offer he must make the change before acceptance. He insists he did change before. Childers testifies he did not claim he had changed but insisted on time to find out what was going on at the well. As we interpret Priddy's testimony, he never once contended he had the right to change after acceptance. At most, he reserved the right to change before acceptance without notice. The issue of fact, and the only one, it seems to us, was: Did he make the change before acceptance by the proposed purchasers? This issue the jury settled against Priddy, and their verdict finds support in the evidence. The heading, "All prices subject to change or withdrawal," stated no more than the law adds to a broker's contract in

the absence of a specific time agreed upon. Such withdrawal would in no manner change or affect any liability of the owner which had arisen out of such employment prior to the withdrawal, and when the broker had complied with the terms of his employment he will be entitled to the agreed commission. Authorities supra, and especially Montgomery Case, which was under a written listing with the express right of withdrawal. Lewis v. Simpson, 122 Iowa, 663, 98 N. W. 508; 4 R. C. L. "Brokers," p. 253, § 9. We cannot assent to the construction of the facts in this case that they conclusively establish an advertisement of solicitation for negotiation. The testimony of Brasher certainly authorized the finding that the list was prepared for brokers, to be used in the sale of the land, for which they were to have 10 per cent. on the price as commission. This authorized a broker to offer land at the price listed. It is apparent Priddy did not have in mind that the list prepared by him was a mere advertisement or a solicitation for negotiations. He says the list was for his private use; that he did not place it in his office with his employees, but that they had access to his desk. An advertisement is usually to inform the public, and not alone for the private use of the owner. Again, he admits there was a 10 per cent. commission on sale, and that Brasher knew that fact. The inference would seem to be that it was 10 per cent. on the list price, and this was compensation to a broker upon sale to a purchaser; that, when a purchaser was presented at the listed price who accepted the offer, the broker was entitled to his compensation. An offer capable of being converted into a contract of sale by acceptance must be made under circumstances evidencing an express or implied intention that his acceptance shall constitute a binding contract. Intention is a question of fact to be ascertained from all the facts. Under the facts of this case they were for the court and jury trying the case. We cannot say as a matter of law they conclusively established there was no offer or intended offer of sale by Priddy at the price listed. On the contrary, we think they show an offer and the authority of a broker to find a purchaser at that price. The facts in this case, aside from the agreement, are sufficient to show the purchasers were ready, willing, and able to buy. The testimony indicates the purchasers went to the office to close up, and Childers says he then told Priddy they were there to close, and they then insisted on closing. When the parties, in open court, agreed that the purchasers were ready, able, and willing to purchase on April 26th, they admitted they were so for the entire day. We do not believe we are justified in saying as a matter of law there was no evidence to submit to the jury on the issues in this case.

We believe the judgment should be affirmed as to both parties appellant.

HALL, J. I concur in so far as the majority opinion affirms the judgment against Brasher, but am unable, for several reasons, to agree to an affirmance as to Priddy. I think the judgment against him should be reversed and rendered.

In the first place, the printed list is not a certain or definite offer to sell the lease at any price, and in my opinion is in fact and in law not an offer to sell at all. While it contains the recital, "Leases near the Burk-Waggoner well for sale by W. M. Priddy," this is followed immediately by the qualifying statement, "All prices subject to change or withdrawal." Fearing that this might not be sufficient to relieve him of an obligation to sell at $5,000, he wrote across the top of the list, "Subject to change without notice." Under the fundamental rules governing the formation of a contract as they relate to the elements of offer and acceptance, the printed list is not an offer because of its indefiniteness and uncertainty as to time and price. It expressly states that the price of $5,000 is subject to change, or even withdrawal, and that, too, without notice. It is a mere advertisement or announcement to the public that Priddy has the leases mentioned in the list which he may or may not, at his option, sell at the prices stated opposite each item. He could not by any combination of words more clearly or explicitly reserve to himself the right to change at any time or even withdraw the prices shown on the list, and that, too, without notice to any one, than has been done. Before an offer can be made the basis of a contract, it must be intended to create and capable of creating legal relations. No such relation could be created by any sort of acceptance under this lease until the acceptor had first ascertained from Priddy or his duly authorized agent that the price had not been changed or withdrawn. Until this was done there was no offer to be accepted, because no definite intent is shown by the list to sell the lease absolutely for $5,000.

"It is essential to a contract that the nature and extent of its obligations be certain. If an agreement is uncertain, it is because the offer was uncertain or ambiguous to begin with, for the acceptance is always required to be identical with the offer or there is no meeting of minds and no agreement. If the person to whom the offer is made sees the uncertainty and proposes a change which will make the agreement certain, this puts an end to the offer, and the agreement which he has suggested is the result of his new offer and the acceptance of the original proposal. Therefore, if the offer is in any case so indefinite as to make it impossible for a court to decide just what it means and to fix exactly the legal liabilities of the parties, its acceptance cannot result in an enforceable agreement." 13 C. J. pp. 266, 267, § 59.

"So a mere advertisement or announcement of goods for sale or a price list or circular calling the attention of prospective purchasers to

goods or prices or a mere offer to sell goods generally does not constitute an offer to sell such goods as may be ordered at the prices named. Thus in the leading case it appeared that the defendant wrote to the plaintiff, saying: 'We are authorized to offer Michigan fine salt in full carload lots of eighty to ninety-five barrels, delivered in your city, at eighty-five cents per barrel.' The plaintiff telegraphed: 'Your letter of yesterday received and noted. You may ship me 2,000 barrels of Michigan fine salt as offered in your letter.' The court held that the letter did not constitute an offer of sale, saying: 'We place our opinion upon the language of the letter of the appellant and hold that it cannot be fairly construed into an offer to sell to the respondent any quantity of salt which he might order nor any reasonable amount he might see fit to order. The language is not such as a business man would use in making an offer to sell to an individual a definite amount of property. The word "sell" is not used. They say, "We are authorized to offer Michigan fine salt, etc.," and volunteer an opinion that at the terms stated it is a bargain. They do not say "We offer to sell to you." They use the general language proper to be addressed generally to those who are interested in the salt trade. It is clearly in the nature of an advertisement or business circular to attract the attention of those interested in that business to the effect that good bargains in salt could be had by applying to them, and not as an offer by which they were to be bound, if accepted for any amount the persons to whom it was addressed might see fit to order. We think the complaint fails to show any contract between the parties.'" 1 Mechem on Sales, § 224.

The same author (sections 252, 253) says:

"A mere offer to enter into a contract can evidently operate only during the period of its continuance. The very purpose of its making, however, contemplates that it shall continue until the other party can act upon it unless it sooner expires by its express or implied limitations or is sooner revoked. But, being purely voluntary, it is equally obvious that the party making the offer may retract it at any time before it has ripened into a contract by acceptance."

Elliott on Contracts, vol. 1, § 27, says:

"Not only must there be an offer, but the offer must be made in such a manner and under such circumstances as to manifest an intention to create and change legal relations. * * * If it is intended merely to start negotiations which may subsequently result in a contract or is intended to call forth an offer from the one to whom it is addressed, its acceptance does not consummate a contract. * * * An agreement to be finally settled must comprise all the terms which the parties intended to introduce into the agreement, and until the terms of a proposal are settled the proposer is at liberty to retire from the bargain. This is particularly applicable to letters and advertisements intended to get trade. Communications couched in general language, proper to be addressed to all who are interested in a particular trade or business, are usually mere advertisements and not proposals."

Page on the Law of Contracts, vol. 1, § 84, says:

"The offer must be one which is intended of itself to create legal relations on acceptance. It must not be a communication of information as to certain facts which may interest the party to whom it is communicated or an offer intended merely to open negotiations which will ultimately result in a contract, or intended to call forth an offer in legal form from the party to whom it is addressed. The commonest examples of offers meant to open negotiations and to call forth offers in the technical sense are the advertisements, circulars, and trade letters sent out by business houses. While it is possible that the offers made by such means may be in such form as to become contracts, they are often merely expressions of a willingness to negotiate. They are frequently declarations of intention as well as expressions of willingness to negotiate. Sometimes they merely give information as to certain facts, such as quantities, qualities, and prices. Whether they are one or all of these is immaterial at our law; the vital question being whether they are promises to incur liability."

In section 87 the same author says:

"Even if an offer is intended to create legal relations, it must be so complete that its terms will enable the court, with the aid of admissible extrinsic evidence, to determine what obligation is imposed upon each party, and whether such obligation has been performed. Contracts of these classes shade imperceptibly into contracts in which the parties have entered into covenants as to each of the matters involved in the transaction, but one or more of such covenants is so vague or indefinite that it cannot be enforced. A contract may be incomplete because the parties have intended to leave certain terms to be settled by subsequent negotiations."

It is said in 13 C. J. 289, § 97:

"Business advertisements, published in newspapers and circulars sent out by mail or distributed by hand, stating that the advertiser has a certain quantity or quality of goods which he wants to dispose of at certain prices, are not offers which become contracts as soon as any person to whose notice they may come signifies his acceptance by notifying the other that he will take a certain quantity of them. They are simply invitations to all persons who may read them that the advertiser is ready to receive offers for the goods at the price stated. It must be remembered, however, that in all these cases the question is one of intention, and that whether or not such transactions are to be construed as agreements depends on the intention of the parties as collected from the language used and the nature of the transaction."

The record shows that a well was going down on an adjoining lease; that there was already a rumor afloat to the effect that the well was a producer, and the aphorism that "fifteen minutes ago is ancient history in the oil game" applies to this transaction with peculiar force; the rule being that an offer to sell property subject to the fluctuation in the

market is not generally considered a continuing offer. 23 R. C. L. p. 1283, § 99. I think the list is, at most, a general advertisement, intended to give brokers and prospective purchasers at large the information that Priddy was the owner of the leases therein listed and was a solicitation for offers to buy, leaving the matter of price open, and expressly reserving to Priddy the right to sell or not, at his option, and, if he decided to sell, then at a price to be fixed and governed by the condition of development in his neighborhood. It is hard to conceive that an owner of leases which might be practically worthless one moment and exceedingly valuable within a few minutes, dependent upon the coming in of a well on the adjoining lease, would make a stated, definite proposition to take a certain price when the whole record shows that the owner was an experienced oil speculator and an extensive owner of leases. While it is true that he has named a price, he has by such strong and unequivocal language indicated that the price was in fact no price at all that I think it is clear that he has a right to change it, and moreover can refuse even at the last moment to sell at any price, even when approached by a prospective purchaser or a broker to whom he has not fixed a definite price. Montgomery Ward & Co. v. Johnson, 209 Mass. 89, 95 N. E. 290. In 23 R. C. L. 1282, § 97, the principle is thus stated:

"An offer which is capable of being converted into a contract of sale by an acceptance must be made under circumstances evidencing an express or implied intention that its acceptance shall constitute a binding contract. If a proposal is intended merely to open negotiations and to solicit offers or tenders on the part of the other party, it is not an offer the acceptance of which will impose on him the obligation of a binding contract, and it is generally held that the mere statement of a price at which property is held is not an offer to sell which may be turned into a binding contract by an acceptance. * * * In its final determination the question seems to be one of intention of the parties, and, being such, it depends upon the facts of the particular case."

The rule announced is applied in section 98, Id.:

"Where one merchant wrote to another that he was authorized to offer a certain commodity at a certain price, it has been held that the letter was in the nature of an advertisement or circular to attract the attention of those interested in the commodity, to the effect that good bargains could be had by applying, and not an offer by which the writer was to be bound if accepted for any reasonable amount the person to whom it was addressed might see fit to order. So a letter requesting the addressee to 'kindly advise us by wire Monday if you can use 1,500 creosote barrels between now and January 1st, at ninety-five cents each, delivered in carload lots' has been held to be a trade inquiry sent out by the writer to its customers, and

not to purport nor to be intended to be a legal offer binding on acceptance. Likewise it has been held that a letter stating that 'I have about eighteen hundred bu. or thereabouts, of millet seed, of which I am mailing you a sample. This millet is recleaned and was grown on sod and is good seed. I want $2.25 per cwt. for this seed f. o. b. Lowell,' was not an offer to sell."

If we adopt the rule of construction that the question of intention controls, we are driven to the conclusion that Priddy did not intend to offer his lease absolutely for $5,000 per acre, or he would not have reserved the right to change or withdraw all prices without notice. An offer subject to such a right is incapable of being converted into a contract by a bare acceptance. Chunn v. Evans, 15 Ga. App. 57, 82 S. E. 631; Cox v. Denton, 104 Kan. 516, 180 Pac. 261; Stein-Gray Drug Co. v. Michelson Co. (Mun. Ct.) 116 N. Y. Supp. 789; Posposia Coal Co. v. Nye-Schneider-Fowler Co., 106 Neb. 4, 182 N. W. 586; 6 R. C. L. "Contracts," p. 600, § 23; 23 R. C. L. "Sales," § 96; 35 Cyc. p. 50.

A price is as essential as any other term of a contract, and, unless this term is made definite by the offer, an acceptance thereof does not bind either party. 6 R. C. L. "Contracts," pp. 648, 649, § 62; State v. Press Association, 159 Mo. 410, 60 S. W. 91, 51 L. R. A. 151, 81 Am. St. Rep. 373; Kelly v. Thuey, 143 Mo. 422, 45 S. W. 300. Quoting from the text of 24 A. & E. Enc. of Law (2d Ed.) p. 29, we find this declaration of the rule:

"The offer must be distinct as such, and not merely an invitation to enter into negotiations upon a certain basis. If it contemplates the arrangement of other conditions, it is a mere proposal to enter into an agreement, and does not become binding upon an acceptance. Advertisements, quotations, price lists, etc., fall within this class, and are not technical offers."

This is the rule even though the list is given to a definite person. 13 C. J. 228, § 96. In the case of Lucas v. Patton, 49 Tex. Civ. App. 62, 107 S. W. 1143, an offer to sell was connected with the qualifying phrase, "I may be willing to take," and it was held that it not only showed no intention to make a binding contract, but that the seller reserved to himself the right to refuse. See J. B. Watkins Land Mortgage Co. v. Campbell, 100 Tex. 542, 101 S. W. 1078; Donnell v. Currie & Dohoney, 62 Tex. Civ. App. 134, 131 S. W. 88; Waco M. & E. Co. v. Allis-Chalmers Co., 49 Tex. Civ. App. 426, 109 S. W. 224; Parker v. Naylor (Tex. Civ. App.) 151 S. W. 1096; L. R. A. 1915F, 824, note.

I dissent for the further reason that Brasher was neither expressly nor impliedly authorized to represent Priddy in selling or listing the lease for sale. Both Priddy and Brasher testified that the latter had no express authority, and this is conceded by the majority opinion. It is uncontroverted that Brasher

was only a bookkeeper in Priddy's office; that he owned no interest in the lease itself, but had only a contingent interest in any profits which might result from a sale; that the printed list recited that the leases were owned by Priddy; and that Childers made no inquiry of Priddy as to final prices or the authority of Brasher until he brought his proposed purchasers to Priddy himself. Childers testified that he went to the office the first day for a listing, and that Brasher gave him a list on this particular lease at $5,000 per acre, agreeing to pay 10 per cent. commissions. His testimony is somewhat confusing with reference to what was done by him the following day. He said:

"I worked on it that [the first] day and did not sell it. The next morning I went back for a verification on the same piece of property, and he [Brasher] verified the same listing. I saw Mr. Brasher. He verified the same listing. I went down and met Judge Brooks and other parties who wanted a proposition and described the property, and before I took them up to the office I went to the office again for a verification on this sale which I got from Mr. Brasher."

When asked about the printed list, he said:

"On that printed price list there was a stipulation written across the top of it, but it said, 'Subject to change without notice.' I saw that the second time that I was there. I saw those words written across it. With reference to how long it was from the last or third time that I was in the office to get a verification until I brought Judge Brooks and the other parties up there, it was not over 30 minutes at the outside—just as soon as I could go from his office down to the hotel and take them up there. During this time I never saw Mr. Priddy."

It is apparent from this testimony that he made three visits to Priddy's office for the purpose 'of having the price verified before he carried his purchasers up for the purpose of consummating the deal, and it seems clear that he saw the list upon his second visit, if not sooner. A stipulation appears in the statement of facts to the effect that the purchasers were ready, willing, and able to purchase at the price of $5,000 on April 26, 1919. Admitting that this is the date when he carried his purchasers to Priddy's office, it does not show that they were ready, willing, and able to take the lease at that price, prior to the time of their interview with Priddy. Even if we accept Childer's theory of the case that Priddy did not have the right to change the price after he brought the purchasers into the office, the burden is upon him to prove that such purchasers were ready, willing, and able at the very time he carried them up to the office on his fourth visit. This he has wholly failed to show. I do not concede, however, that if they had shown their willingness Priddy could not have, nevertheless, changed his price or refused to sell at all. If they went to his office for the purpose of taking the lease at $5,000, it would, under the authorities hereinbefore quoted, I think, have simply been an offer to buy at that price, which could have been accepted or rejected by Priddy. We should presume from the fact that Childers made frequent visits to Priddy's office for a verification of the price that he fully understood that the price stated upon the list was not definite and final, and that Priddy had reserved the right to change it at any time. It is a practical construction by him of the effect of the printed list, which should be binding upon the court. Neither can I agree with the majority in the holding that the assumed agency of Brasher is sufficient to bind Priddy or that the latter has, by his conduct, in any way estopped himself from denying Brasher's authority. Brasher's statement to Childers that he owned an interest in the lease and that the price was still $5,000, made in Priddy's absence, cannot bind the latter. Brasher was neither a partner nor a cotenant in the ownership of the lease.

"The authority of an agent and its nature and extent where these questions are directly involved can only be established by pressing it to its source in some work or act of the alleged principal. The agent certainly cannot confer authority upon himself or make himself an agent merely by saying that he is one. Evidence of his own statements, declarations, or admissions, made out of court, therefore (as distinguished from his testimony as a witness), is not admissible against his principal for the purpose of establishing, enlarging, or renewing his authority, Nor can his authority be established by showing that he acted as agent or that he claimed to have the powers which he assumed to exercise." 1 Mechem on Agency (2d Ed.) § 285.

"The agent's authority, moreover, may not be shown merely by proving that he acted as agent. A person can no more make himself an agent by his own acts than he can by his own declarations or statements." Id. § 289.

Aside from his own statements and acts, upon which the majority opinion seems to be based, I am unable to find anything in the record which tends to show that Childers could lawfully conclude that Priddy had clothed Brasher with authority to do more than hand out and mail the printed price-list. Even the stenographers in the office had this authority. The list expressly states that Priddy is the owner of the leases. As a matter of law a general agent has no authority to do any act toward the sale of his principal's real estate. According to the uncontradicted testimony, Brasher was bookkeeper, with no power beyond the duties incident to his employment. Practically all the authorities agree that a real estate broker is not a general, but a special, agent, with limited authority, and declare that one dealing with him does so at his peril and must inform himself as to the powers of such

agent. 2 C. J. 525, §§ 26, 27; 1 Mechem (2d Ed.) §§ 799, 742; 9 C. J. 510, § 7; Swift v. Erwin, 104 Ark. 459, 148 S. W. 267, Ann. Cas. 1914C, 363; Halsey v. Monteiro, 92 Va. 581, 24 S. E. 258.

The jury's finding that Brasher owned an interest in this particular lease is unsupported by a scintilla of testimony, and the further finding that he was authorized by Priddy to place the land with appellee for sale at $5,000 per acre has no foundation in the record aside from his own declarations and acts. The latter finding, being unsupported by the facts, is therefore an erroneous conclusion of law, necessarily based upon the legal effect of the price list as an offer to sell. In so finding the jury assumed the prerogative of the court. In my opinion the propositions insisting that the evidence is insufficient to sustain a judgment for the plaintiff should be sustained as to Priddy.

For the reasons stated, I respectfully dissent.